# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SUN LIFE ASSURANCE COMPANY )
OF CANADA )
            )
        Plaintiff, )
            )
      v. )           **No. 12 CV 07330**
            )
GREAT LAKES BUSINESS CREDIT LLC, )       **Chief Judge Ruben Castillo**
COMMUNITY BANK OF OAK PARK )
RIVER FOREST, and STUART A. )
SWEZEY, )
            )
        Defendants. )

## MEMORANDUM OPINION AND ORDER

Sun Life Assurance Company of Canada ("Sun Life") brings this interpleader action under 28 U.S.C. §§ 1332 and 1335 and Federal Rule of Civil Procedure 22 against Great Lakes Business Credit, LLC ("Great Lakes"), Community Bank of Oak Park River Forest ("Community Bank"), and Stuart A. Swezey, to settle competing claims made by Great Lakes and Community Bank to the surrender value of a life insurance policy Sun Life issued to Swezey. (R. 1, Compl.) Presently before the Court are Great Lakes' and Community Bank's cross-motions for summary judgment, (R. 22, Great Lakes' Mot. Summ. J.; R. 26, Community Bank's Mot. Summ. J.), and Community Bank's motion to strike some of Great Lakes' answers to the complaint, (R. 13, Community Bank's Mot. Strike). For the reasons stated below, the motion to strike is denied in part and granted in part, and both motions for summary judgment are denied.

1

## I.      Motion to strike

Before summarizing the facts of this case, the Court first addresses Community Bank's motion to strike portions of Great Lakes' answer to Sun Life's complaint, which Community Bank filed on January 4, 2013.  (R. 13, Community Bank's Mot. Strike.)  Federal Rule of Civil Procedure 12(f) provides that "[u]pon motion made by a party . . . the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Generally, motions to strike are disfavored.  *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989).  However, such motions are not disfavored where they remove "unnecessary clutter" from the litigation.  *Id.* at 1294  (noting the general rule that motions to strike are disfavored, but affirming the district court's decision to strike the defendant's affirmative defenses where those defenses where legally insufficient and consisted of "nothing but bare bones conclusory allegations"); *see also Reis Robotics USA, Inc. v. Concept Indus., Inc.*, 462 F.Supp.2d 897, 907 (N.D. Ill. 2006) (striking defendant's answer for failure to comply with Federal Rule of Civil Procedure 8(b)'s directive that parties admit, deny

---

[1] The Court takes the undisputed facts from the parties' Local Rule 56.1 statements of material facts.  (R. 24, Community Bank's Local Rule 56.1 Statement of Material Facts ("Community Bank's Facts"); R. 27, Great Lakes' Local Rule 56.1 Response to Community Bank's Local Rule 56.1 Statement of Material Facts ("Great Lakes' Rule 56.1 Resp.") & Great Lakes' Statement of Additional Facts both in Response to Community Bank's Motion for Summary Judgment and in Support of its Cross-Motion for Summary Judgment ("Great Lakes' Facts"); R. 29, Great Lakes' Correction to Fact No. 14 ("Great Lakes Fact No. 14"); R. 32, Community Bank's Response to Great Lakes' Local Rule 56.1 Statement of Material Facts ("Community Bank's Rule 56.1 Resp.") & Community Bank's Additional Facts in Response to Great Lakes' Cross-Motion for Summary Judgment ("Community Bank's Add'l Facts"); R. 34, Great Lakes' Response to Community Bank's Additional Facts ("Great Lakes' Resp. Add'l Facts")).  Community Bank's Facts are nearly identical to its Additional Facts, and Great Lakes' response to Community Bank's Facts is nearly identical to its Response to Community Bank's Additional Facts.  Thus, for the sake of clarity, the Court will only cite to Community Bank's Facts and Great Lakes' Facts unless specifically noted.

or claim insufficient knowledge to admit or deny or in short, plain terms). Ultimately, the decision whether to strike material is within the district court's discretion. *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 665 (7th Cir. 1992).

**A.      Motion to strike paragraphs 12, 14, and 15**

Community Bank moves to strike parts of paragraphs 12, 14, and 15 from Great Lakes' answer, alleging that they contain unnecessary clutter and are immaterial to the dispute. (R. 13, Community Bank's Mot. Strike at 2-3.) In paragraph 12, Great Lakes admits that Swezey assigned the life insurance policy herein at issue to Great Lakes and then extensively details subsequent transactions involving additional entities that were assigned the same policy. (R. 11, Great Lakes' Answer ¶ 12.) Community Bank contends that the allegations in Great Lakes' answer are immaterial and "bear no relation to the controversy in this litigation." (R. 13, Community Bank's Mot. Strike at 3) (citing *Talbot*, 961 F.2d at 654). Community Bank asks the Court to strike the entirety of Great Lakes' answer in paragraph 12 with the exception of the first word: "Admitted." (*Id.*) Because Great Lakes' answers in paragraphs 14 and 15 incorporate its answer in paragraph 12, Community Bank also seeks to strike those answers with the exception of the word "Admitted." (*Id.*) Community Bank contends that it is prejudiced by the surplusage because the interpleader posture of the case does not permit a response to Great Lakes' answer. (R. 21, Community Bank's Reply Mot. Strike at 1.)

Motions to strike are properly denied "when no prejudice could result from the challenged allegations, even though the matter literally is within the category set forth in Rule 12(f)." *VPHI, Inc. v. Nat'l. Educ. Training Grp., Inc*., No. 94 C 5559, 1995 WL 51405, at *3 (N.D. Ill. Jan. 20, 1995) (quoting 5 Wright & Miller, Federal Practice and Procedure, § 1382). Prejudice results when the matter complained of has the effect of confusing the issues or where it is so lengthy and complex that it places an undue burden on the responding party. *Id.* Community Bank's contention that it is prejudiced by the surplusage rings hollow because it could—and did—challenge any claims in Great Lakes' answer in its own motion for summary judgment and subsequent briefing. Furthermore, Community Bank's argument that the

4

additional facts in Great Lakes' answer to paragraph 12 should be stricken is significantly undermined by the recitation of much of the same information in Community Bank's own Local Rule 56.1 Statement of Undisputed Material Facts. (*See* R. 24, Community Bank's Facts ¶¶ 14-18). Community Bank cannot have it both ways; if the information in question warrants discussion in Community Bank's Statement of Undisputed Material Facts, then its materiality is sufficient to withstand a motion to strike. Thus, the Court declines to strike the additional facts in Great Lakes' answer.

Community Bank also takes issue with the alleged "specious legal argument" in Great Lakes' answer to paragraph 12. (R. 21, Community Bank's Reply Mot. Strike at 1.) Great Lakes' answer does contain argumentative statements, but the Court does not need to resort to the drastic measure of striking the entire answer. To the extent that the answer contains an inappropriate argument, the Court will not consider it. "Indeed, it is the function of the Court, with or without a motion to strike . . . to eliminate from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement." *Prince v. Chi. Public Sch.*, No. 09-CV-2010, 2011 WL 3755650, at *2 (N.D. Ill. Aug. 25, 2011). Community Bank faces no prejudice from the admission of Great Lakes' answer to paragraph 12, and the interpleader nature of this case does not prevent Community Bank from effectively responding to Great Lakes' allegations. Consequently, the Court declines to strike Great Lakes' answer to paragraphs 12, 14 and 15.

### B.     Motion to strike paragraphs 2, 4, 5, 10, 11, 13, 16, and 17

Community Bank also moves to strike the phrase "demands strict proof thereof" that Great Lakes repeats in its responses to paragraphs 2, 4, 5, 10, 11, 13, 16, and 17 of its answer. (R. 21, Community Bank's Reply Mot. Strike at 4.) Specifically, Great Lakes avers that it is

5

"without sufficient information to admit or deny the allegation, and thus denies the allegation and demands strict proof thereof."  (R. 11, Great Lakes' Answer.)  Community Bank argues that the phrase "demands strict proof thereof" should be stricken from Great Lakes' answers because the phrase conflicts with the requirements of the Federal Rules of Civil Procedure.  (R. 21, Community Bank's Reply Mot. Strike at 4.)  The Federal Rules contain no references to strict proof.  *State Farm Mut. Auto Ins. Co. v. Riley*, 199 F.R.D. 276, 278 (N.D. Ill. 2001).  Rule 8(b) of the Federal Rules of Civil Procedure requires a responsive pleading to admit or deny each allegation or to state that the party "lacks knowledge or information sufficient to form a belief about the truth of [the] allegation;" nothing more and nothing less. Fed. R. Civ. P. 8(b).  Thus, the Court finds that demands for "strict proof" in are improper and meaningless and clearly violate Rule 8(b).  *See, e.g.*, *Donnelly v. Frank Shirey Cadillac, Inc.*, No. 05 C 3520, 2005 WL 2445902, at *1 (N.D. Ill. Sept. 29, 2005); *see also State Farm Mut. Auto Ins*., 199 F.R.D. at 278 (N.D. Ill. 2001); *Jones v. Sabis Educ. Sys., Inc.*, No. 98 C 4252, 2000 WL 369720, at *4-5 (N.D. Ill. Apr. 7, 2000); *Gilbert v. Johnston*, 127 F.R.D. 145, 146 (N.D. Ill. 1989).  Accordingly, the Court grants Community Bank's motion to strike the phrase "demands strict proof thereof" from Great Lakes' answers in paragraphs 2, 4, 5, 10, 11, 13, 16, and 17.

## II.    The undisputed material facts

Swezey is president of Gabriel Sales Company of Oak Park ("Gabriel Oak Park"), a wholesale distributor of replacement automobile parts based in the Northern District of Illinois.[2]

---

[2] Both parties offer documentation listing conflicting locations for Gabriel Oak Park. Gabriel Oak Park's Bankruptcy Petition lists Gabriel Oak Park's location as Northlake, Illinois.  (R. 23-7, Ex. B, Gabriel Oak Park's Bankruptcy Pet'n at 1.)  The Amended Bankruptcy Petition, however, lists Gabriel Oak Park's location as Melrose Park, Illinois.  (R. 27-8, Ex. 2, Gabriel Oak Park's Am. Bankruptcy Pet'n at 1.)  Nonetheless, all of the locations listed for Gabriel Oak Park are located in the Northern District of Illinois, Eastern Division.

(R. 27, Great Lakes' Rule 56.1 Resp. ¶ 4; R. 23-7, Ex. B, Gabriel Oak Park's Bankruptcy Pet'n at 3; R. 32, Community Bank's Rule 56.1 Resp. ¶ 1.)  Sun Life is a Massachusetts corporation authorized to do business in Illinois, with its principal place of business in Wellesley Hills, Massachusetts.  (R. 1, Compl. ¶ 2; R. 27, Great Lakes' Rule 56. 1 Resp. ¶ 1.)  The genesis of this litigation stems from a life insurance policy (the "Policy"), issued by Sun Life to Swezey, that provides certain benefits payable upon the death of Swezey.  (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 7.)  Swezey named Betty Swezey as the primary beneficiary of the Policy.  (*Id.*)  As of September 10, 2012, the death benefit of the Policy is $400,000; the surrender value is $153,845.67.  (*Id.*)  Through various loan documents, detailed below, an interest in the Policy was assigned to both Great Lakes and Community Bank.

### A.    Community Bank's loans to Gabriel Oak Park

Community Bank is a financial institution incorporated in Illinois, with its principal place of business in Oak Park, Illinois.  (R. 10, Community Bank's Answer ¶ 4; R. 27, Great Lakes' Rule 56. 1 Resp. ¶ 2.)

On August 29, 2000, Gabriel Oak Park entered into a loan agreement with Community Bank (the "Community Bank Loan Agreement"), whereby Community Bank issued Gabriel Oak Park a $330,000 term loan and a $200,000 revolving line of credit (the "Community Bank Loan").  (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 8; R. 23-2, Ex. A-1, Community Bank Loan Agreement.)  In 2002, Community Bank renewed the Loan, (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 9; R. 23-1, Ex. A, Braasch Decl. ¶ 6), and on February 15, 2002, pursuant to the Loan renewal, Swezey assigned the Policy to Community Bank (the "Policy Assignment Community Bank").  (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 9; R. 34, Great Lakes' Resp. Add'l Facts ¶ 1; R. 23-3, Ex. A-2, Policy Assignment Community Bank at 2.)  On September 27, 2002, Sun Life

7

acknowledged the assignment. (R. 23-3, Ex. A-2, Policy Assignment Community Bank at 3.) Per the terms of the assignment, Community Bank received the sole right to collect from Sun Life the net proceeds of the Policy and the sole right to surrender the Policy in exchange for the surrender value of the Policy. (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 11; R. 23-3, Ex. A-2, Policy Assignment Community Bank ¶ B(1)-(2).) The assignment further states: "In the event of any conflict between the provisions of this assignment and provisions of the note or other evidence of any Liability, with respect to the Policy or rights of collateral security therein, the provisions of this assignment shall prevail." (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 11; R. 23-3, Ex. A-2, Policy Assignment Community Bank ¶ J.) In April 2004, Community Bank subsequently extended an additional line of credit of $300,000 to Gabriel Oak Park, bringing Gabriel Oak Park's total indebtedness to Community Bank to about $620,000. (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 12; R. 23-1, Ex. A, Braasch Decl. ¶ 8.) In August 2008, Community Bank loaned Gabriel Oak Park $617,103 to consolidate all of Gabriel Oak Park's remaining debt into one loan, for which Gabriel Oak Park executed a promissory note to Community Bank ("Gabriel Oak Park Note"). (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 17; R. 23-6, Ex. A-5, Gabriel Oak Park Note.)

### B.     Great Lakes' loan to Gabriel Oak Park and the Intercreditor Agreement

Great Lakes is a Michigan limited liability company authorized to do business in Illinois, with its principal place of business in Troy, Michigan. (R. 11, Great Lakes' Answer ¶ 3; R. 27, Great Lakes' Rule 56.1 Resp. ¶ 3.) In September 2005, when Gabriel Oak Park could not qualify for additional loans from Community Bank due to Gabriel Oak Park's recent losses, Great Lakes agreed to extend credit to Gabriel Oak Park. (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 8

13.)  In January 2006, Great Lakes agreed to loan Gabriel Oak Park $500,000 (the "Great Lakes Loan") under certain conditions, including Community Bank subordinating its liens to Great Lakes' liens pursuant to an Intercreditor and Subordination Agreement ("Intercreditor Agreement").      (R. 32, Community Bank's Rule 56. 1 Resp. ¶ 2; R. 27-1, Ex. 1, Campbell Decl. ¶ 5.)  Great Lakes and Community Bank executed the Intercreditor Agreement on January 25, 2006; it provides, in part, that (1) the Great Lakes Loan was secured by a first lien on Gabriel Oak Park's "accounts, inventory and equipment, together with the proceeds thereof, ('Great Lakes Collateral')," and (2) Community Bank must subordinate any security interest it had (or would thereafter acquire) in the Great Lakes Collateral to Great Lakes' security interest.  (R. 27, Great Lakes' Rule 56.1 Resp.  ¶ 14; R. 23-4, Ex. A-3, Intercreditor Agreement at Recitals A-D, ¶ 1.)

    In addition to the Intercreditor Agreement and also on January 25, Great Lakes entered into a separate agreement with Gabriel Oak Park to secure the Great Lakes Loan (the "Great Lakes Loan Agreement").  (R. 32, Community Bank's Rule 56.1 Resp. ¶ 3; R. 27-2, Ex. 1-A, Great Lakes Loan Agreement.)  The Great Lakes Loan was secured by Gabriel Oak Park's account receivables, instruments, general intangibles, inventory, equipment, furniture and fixtures.  (R. 27, Great Lakes' Facts ¶ 4; R. 27-2, Ex. 1-A, Great Lakes Loan Agreement § 3.)  Great Lakes amended the Great Lakes Loan Agreement several times to increase the amount loaned to Gabriel Oak Park and to include additional collateral that Gabriel Oak Park offered to secure the additional loaned amount.  (R. 27, Great Lakes' Facts ¶ 11.)

    Also on January 25, 2006, in connection with the Great Lakes Loan, Swezey assigned to Great Lakes an interest in the Policy.  (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 15; R. 32, Community Bank's Rule 56. 1 Resp. ¶ 9; R. 27-6, Ex. 1-E, Policy Assignment Great Lakes.)
9

Sun Life acknowledged the assignment on April 21, 2006. (R. 27-6, Ex. 1-E, Sun Life Acknowledgment Letter at 1.) Community Bank argues that this assignment is invalid because Swezey ceased to have any rights to the Policy after he assigned it to Community Bank four years earlier. (R. 23, Community Bank's Mem. Summ. J. at 6-7.) To date, Gabriel Oak Park owes Great Lakes in excess of $316,695.44. (R. 27, Great Lakes' Facts ¶ 11; R. 27-1, Ex. 1, Campbell Decl. ¶ 13.)

### C. Formation and Transactions of Gabriel Chicago

Swezey formed Gabriel Sales of Chicago, LLC ("Gabriel Chicago"), on April 6, 2006. (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 20; R. 32, Community Bank's Rule 56.1 Resp. ¶ 20.) Gabriel Chicago is an Illinois limited liability company with its chief executive office in Forest Park, Illinois. (R. 23-5, Ex. A-4, Gabriel Chicago Loan Agreement.) Gabriel Chicago was formed in order to purchase inventory and other assets from Mutual Truck Company. (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 21; R. 32, Community Bank's Rule 56.1 Resp. ¶ 21.) Mutual Truck Company and Gabriel Oak Park had similar businesses, although Mutual Truck Company focused on truck parts, whereas Gabriel Oak Park dealt mainly with car parts. (R. 32, Community Bank's Rule 56.1 Resp. ¶ 22.) In 2006, Community Bank agreed to loan Gabriel Chicago $325,000 (the "Gabriel Chicago Loan") to finance the purchase of Mutual Truck Company's inventory and other assets pursuant to a Loan and Security Agreement ("Gabriel Chicago Loan Agreement"). (R. 27, Great Lakes' Facts ¶ 16; R. 32, Community Bank's Rule 56.1 Resp. ¶ 21; R. 23-5, Ex. A-4, Gabriel Chicago Loan Agreement.) Pursuant to the Gabriel Chicago Loan Agreement, Gabriel Oak Park guaranteed the obligations of Gabriel Chicago (the "Gabriel Oak Park Guaranty"). (R. 32, Community Bank's Rule 56.1 Resp. ¶ 16; R. 23-5, Ex. A-4, Gabriel Oak Park Guaranty.)

10

In September 2008, one month after consolidating Gabriel Oak Park's debt into the Gabriel Oak Park Note, Community Bank extended a new loan in the amount of $774,775 to Gabriel Chicago in order for Gabriel Chicago to repay the outstanding balance of the Gabriel Chicago Loan and to purchase the Gabriel Oak Park Note (the "Gabriel Chicago Amended Loan Agreement").  (R. 32, Community Bank's Rule 56.1 Resp. ¶ 27; R. 27-15, Ex. 9, Gabriel Chicago Am. Loan Agreement ¶ 4.)  As part of the Gabriel Chicago Amended Loan Agreement, Community Bank assigned to Gabriel Chicago the Gabriel Oak Park Note and other assets (the "Community Bank Note Assignment").  (R. 32, Community Bank's Rule 56.1 Resp. ¶ 29; R. 27-10, Ex. 4, Community Bank Note Assignment.)  On the same day, Gabriel Chicago assigned back to Community Bank the Gabriel Oak Park Note (the "Gabriel Chicago Note Assignment").  (R. 32, Community Bank's Rule 56.1 Resp. ¶ 30; R. 27-11, Ex. 5, Gabriel Chicago Note Assignment.)

### D.    Gabriel Oak Park files for Bankruptcy and Community Bank seeks to recover from the Policy

Gabriel Oak Park filed for bankruptcy on October 5, 2012.  (R. 11, Community Bank's Answer ¶ 12; R. 23-7, Ex. B, Gabriel Oak Park's Bankruptcy Pet'n at 3.)  In an effort to satisfy Gabriel Oak Park's outstanding financial obligations, Community Bank requested the surrender value of the Policy from Sun Life on June 28, 2012, and requested that Sun Life pay the proceeds directly and solely to Community Bank.  (R. 27, Great Lakes' Rule 56.1 Resp. ¶ 19.)  Sun Life refused to honor Community Bank's request on the basis that Swezey's assignment of the Policy to Great Lakes might subject Sun Life to multiple liability.  (*Id.*)  Gabriel Oak Park's bankruptcy petition lists a subordinated outstanding debt of $229,512.76 to Community Bank.  (R. 23-7, Ex. B, Gabriel Oak Park Bankruptcy Pet'n at 4, 12.)  In a deposition pertaining to

Gabriel Oak Park's bankruptcy filing, however, Swezey testified that Gabriel Chicago, not Gabriel Oak Park, owes Community Bank the outstanding $229,512.76. (R. 27-9, Ex. 3, Swezey Dep. at 93:2-94:8.)

## PROCEDURAL HISTORY

Sun Life initiated this interpleader action on September 13, 2012. (R. 1, Compl.) Sun Life alleged that it was exposed to multiple liability due to the competing claims to the Policy by Community Bank and Great Lakes. (*Id.* ¶ 1.) On September 18, 2012, the Court granted judgment in favor of Sun Life and directed Sun Life to deposit the proceeds of the Policy with the Clerk of the Court. (R. 4, Min. Entry.)

On December 4, 2012, the Court entered a default judgment against Swezey for failure to timely appear, answer or otherwise plead to the complaint. (R. 9, Min. Entry.) Community Bank and Great Lakes filed answers to the Complaint on December 20 and 27, 2012, respectively. (R. 10, Community Bank's Answer; R. 11, Great Lakes' Answer.) Community Bank and Great Lakes both allege that they are entitled to the proceeds of the Policy. (R. 10, Community Bank's Answer; R. 11, Great Lakes' Answer.) On January 25, 2013, Community Bank filed a motion for summary judgment. (R. 22, Community Bank's Mot. Summ. J.) Great Lakes filed a cross-motion for summary judgment on February 25, 2013. (R. 26, Great Lakes' Mot. Summ. J.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has said that summary judgment is proper "'if the pleadings, depositions, answers to

12

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c) (1987)). In deciding a motion for summary judgment, the Court does not evaluate the weight of the evidence, judge the credibility of the witnesses, or determine the ultimate truth of the matter; instead, it is the function of the Court in ruling on a motion for summary judgment to ascertain whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986). "A disputed fact is 'material' if it might affect the outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Omnicare Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) ("Even on summary judgment, district courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record.")

The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). The moving party "can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993) (citing *Celotex*, 477 U.S. at 325); *Wheeler*, 539 F.3d 634 ("The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing 'that there is an absence of evidence to support the non-moving party's case.'") (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the non-moving party must "set forth specific facts showing that there is a genuine issue for

13

trial." *Celotex Corp.*, 477 U.S. at 322 n.3 (quoting Fed. R. Civ. P. 56(e) (1987)); *Wheeler*, 539

F.3d at 634 ("To overcome a motion for summary judgment, the non-moving party must come

forward with specific facts demonstrating that there is a genuine issue for trial." (citing

*Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The non-moving

party may not rely on mere conclusions or allegations to create a genuinely disputed issue of

material fact. *See Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309,

320 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 247-48). Nor can mere speculation "be used to

manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008)

(internal quotation marks omitted) (quoting *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th

Cir. 2001)). In order to defeat a motion for summary judgment, the nonmoving party "must

make a showing sufficient to establish any essential element of [his] cause of action for which

[he] will bear the burden of persuasion at trial." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427

(7th Cir. 1997) (citing *Celotex Corp.*, 477 U.S. at 322). "The existence of a mere scintilla of

evidence, however, is insufficient to fulfill this requirement. The nonmoving party must show

that there is evidence upon which a jury reasonably could find for [him]." *Wheeler*, 539 F.3d at

634 (internal citation omitted). On cross-motions for summary judgment, each movant must

satisfy the requirements of Federal Rule of Civil Procedure 56. *See Cont'l Cas. Co. v. NW Nat'l

Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).

## ANALYSIS

### I.      Jurisdiction and applicable law

The parties agree that jurisdiction and venue with this Court are proper, but this Court

must consider the issue on its own initiative. *Fid. & Deposit Co. of Md. v. City of Sheboygan

Falls*, 713 F.2d 1261, 1264-65 (7th Cir. 1983). The Court has subject matter jurisdiction of this

14

lawsuit pursuant to 28 U.S.C. § 1335 because the adverse claimants are of diverse citizenship,

the amount in controversy exceeds $500.00, and the surrender value of the Policy has been

deposited with the clerk of the court. 28 U.S.C. § 1335. In federal cases based on diversity

jurisdiction, federal courts apply state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 79

(1938). Accordingly, the Court applies Illinois State law to the parties' state law arguments.

## II. The cross-motions for summary judgment

The main thrust of Community Bank's argument is that the Policy is a personal asset of

Swezey, and, therefore, is not part of the collateral to which Great Lakes maintains a first

priority lien. Thus, Community Bank argues that because Swezey assigned the Policy to

Community Bank first, it has the senior interest pursuant to the general rule of "first in time, first

in right." (R. 31, Community Bank's Reply at 3) (citing *In re Key West Rest. & Lounge, Inc.*, 54

B.R. 978, 990 (Bankr. N.D. Ill. 1985)). On the other hand, Great Lakes maintains that the Policy

is indeed a part of the collateral to which Great Lakes maintains a first priority lien and that it

therefore holds the senior interest in the Policy. (R. 28, Great Lakes' Mem. at 7.) Great Lakes

also argues that Community Bank's sale of the Gabriel Oak Park Note to Gabriel Chicago and

the subsequent transactions invalidated Community Bank's security interest in the policy. (*Id*. at

9.) Further, Great Lakes contends that Community Bank has not satisfied the conditions

necessary to obtain the Policy proceeds. (*Id*. at 13.) Finally, Great Lakes alleges that

Community Bank's interest in the Policy is a lien, not an absolute right that would invalidate

later assignments of the Policy, because Swezey retained an interest in the Policy when he

assigned an interest to Community Bank. (R. 28, Great Lakes' Mem. at 14-15.) The Court

addresses each of these arguments in turn.

15

### A. Whether the Intercreditor Agreement subordinates Community Bank's interest in the Policy to Great Lakes' interest

Community Bank contends that three simple facts are dispositive in the dispute: (1) in 2002, Swezey assigned his Policy to Community Bank to secure the Community Bank Loan to Gabriel Oak Park; (2) in 2006, Swezey executed another assignment of the Policy to Great Lakes to secure the Great Lakes Loan to Gabriel Oak Park; and (3) Gabriel Oak Park owes Community Bank in excess of $229,512.76, as evidenced by Gabriel Oak Park's bankruptcy filing. (R. 31, Community Bank's Reply at 2.) Community Bank argues that "absent other circumstances, the timing of the 2002 assignment to Community Bank versus the 2006 assignment to Great Lakes would be dispositive." (*Id.* at 3.) Community Bank argues that the Intercreditor Agreement has "no effect on Community Bank's priority security interest in the policy" because the clear language of the agreement requires Community Bank to subordinate only its security interest in the Great Lakes Collateral. (*Id.* at 6.)

The Intercreditor Agreement specifies that Community Bank's interest *in the Great Lakes Collateral* is subordinate to Great Lakes' interest. (R. 23-4, Ex. A-3, Intercreditor Agreement ¶ D.) Thus, whether the Intercreditor Agreement entails a subordination of Community Bank's interest in the Policy depends on whether the Policy is part of the Great Lakes Collateral. The Intercreditor Agreement defines the Great Lakes Collateral as the "accounts, inventory and equipment, together with the proceeds thereof." (R. 31, Community Bank's Reply at 6; R. 23, Ex. A-3, Intercreditor Agreement ¶ B.) Community Bank argues that this language in the Intercreditor Agreement is clear and unambiguous, and therefore the Agreement must be enforced as written. (R. 31, Community Bank's Reply at 6-8) (citing *Harbor Market, Inc. v. Gronda*, 743 N.W.2d 585, 589 (Mich Ct. App. 2008); *Coates v. Bastian Brothers, Inc.*, 741

16

N.W.2d 539, 543 (Mich. Ct. App. 2007); *City of Grosse Pointe Park v. Mich Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 115-16 (Mich. 2005)).  Community Bank alleges that it and Great Lakes negotiated the wording of the Intercreditor Agreement and specifically excluded the Policy as part of the Great Lakes Collateral.  (R. 31, Community Bank's Reply at 7; R. 31-1, Ex. A, Suppl. Braasch Decl. ¶ 18.)  Community Bank contends that because the Policy is not "accounts, inventory and equipment," it is not included in the Great Lakes Collateral, and Community Bank's interest in the Policy is not subordinate to Great Lakes' interest.  (R. 31, Community Bank's Reply at 6.)

Great Lakes contends that the Great Lakes Collateral described in the Intercreditor Agreement is actually a reference to the Great Lakes Loan Agreement, which defines "Great Lakes Collateral" more broadly to include "accounts, contract rights, instruments, chattel paper, intellectual property, inventory, cash and non-cash proceeds, equipment, furniture, and fixtures." (R. 28, Great Lakes' Mem. at 7; R. 27-2, Ex. 1-A, Great Lakes Loan Agreement § 3.1.)  It argues that "where additional documents or terms are made part of a written contract by reference, the parties are bound by those additional terms even if they have never seen them."  (R. 33, Great Lakes' Reply at 3) (quoting *Constr. Fasteners, Inc. v. Digital Equip. Co. Inc.*, No. 185679, 1996 WL 33348735, at *2 (Mich. Ct. App. Oct. 22, 1996)).

The Court must thus determine the meaning of "Great Lakes Collateral" in the Intercreditor Agreement.  *See Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 602 (7th Cir. 1989) ("Summary judgment is particularly appropriate in cases involving the interpretation of contractual documents.").  The Intercreditor Agreement clearly states that it is governed by Michigan law, (R. 23-4, Ex. A-3, Intercreditor Agreement ¶ 3(h)), and both Community Bank and Great Lakes cite Michigan law in their pleadings. The law governing choice of law is

17

substantive law, *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498 (1941), and thus the Court applies Illinois law governing choice of law. Illinois law instructs that express choice of law provisions in contracts are to be given full effect as long as they do "not contravene Illinois public policy and there is some relationship between the chosen forum and the parties to the transaction." *Freeman v. Williamson*, 890 N.E.2d 1127, 1133 (Ill. App. Ct. 1st Dist. 2008). Here, the use of Michigan law does not contravene public policy and there is a clear relationship between the parties and the chosen forum because Great Lakes is a Michigan corporation. Therefore, the Court applies Michigan law to determine the meaning of the provision in the Intercreditor Agreement that defines the Great Lakes Collateral.

Under Michigan law, "whether a contract is ambiguous is a question of law," appropriate for a court to decide. *Coates*, 741 N.W.2d at 543. A contract is ambiguous when "when two provisions irreconcilably conflict with each other, or when a term is equally susceptible to more than a single meaning." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003). The plain language of the relevant provision of the Intercreditor Agreement provides a clear definition of precisely what constitutes Great Lakes Collateral: "Borrower's accounts, inventory and equipment, together with the proceeds thereof." (R. 23-4, Ex. A-3, Intercreditor Agreement ¶ B.) This language so plainly excludes the Policy that the Court fails to find an alternative reading under which the Policy might be included. Michigan law instructs that "if the language of the contract is clear and unambiguous, it is to be construed according to its plain sense and meaning," and warns that courts may not impose an ambiguity on clear contract language. *Grosse Pointe Park*, 702 N.W.2d at 113. The Court finds that the Intercreditor Agreement is not ambiguous, and, therefore, should be interpreted using its plain meaning. As

18

the Intercreditor Agreement clearly states, the Great Lakes Collateral is limited to Gabriel Oak Park's accounts, inventory, equipment, and the proceeds thereof; it does not include the Policy.

Seeking to avoid this result, Great Lakes argues, in essence, that the Intercreditor Agreement contains a latent ambiguity and can only be accurately interpreted by examining the Great Lakes Loan Agreement. (R. 28, Great Lakes' Mem. at 7.) Specifically, Great Lakes contends that the definition of "Great Lakes Collateral" in the Intercreditor Agreement references the fact that the Great Lakes Loan was secured by additional assets beyond what was listed in the Intercreditor Agreement and that "Community Bank was well aware of the full extent of Great Lakes' secured interest" when it signed the Intercreditor Agreement. (*Id.* at 7-9.) Great Lakes thus argues that "Great Lakes Collateral" as used in the Intercreditor Agreement includes "accounts, contract rights, instruments, chattel paper, intellectual property, inventory, cash and non-cash proceeds, equipment, furniture and fixtures," as defined by the Great Lakes Loan Agreement. (*Id.* at 7) (citing R. 27-7, Ex. 1-F, Intercreditor Agreement; R. 27-2, Ex. 1-A, Great Lakes Loan Agreement § 3.1(1)-(8)).

Under Michigan law, a court must "consider the extrinsic evidence to determine if there exists an ambiguity and then, if an ambiguity does exist, the court must consider extrinsic evidence to resolve that ambiguity." *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 812 (6th Cir. 2007) (applying Michigan law). A latent ambiguity exists when the language in a contract "appears to be clear and intelligible and suggests a single meaning, but other facts create the 'necessity for interpretation or a choice among two or more possible meanings.'" *Shay v. Aldrich*, 790 N.W.2d 629, 641 (Mich. 2010) (quoting *McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340, 344 (Mich. 1964)). To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if that evidence
19

supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation. *Id.* The burden is on the party alleging the ambiguity to present an interpretation of the contract "that is equally as plausible as the common sense interpretation." *Smith v. ABS Indus., Inc.*, 890 F.2d 841, 846 (6th Cir. 1989) (applying Michigan law).

Thus, the Court must look beyond the plain language of the Intercreditor Agreement, which appears to clearly define "Great Lakes Collateral" and does not appear to reference any additional documents, to determine if the extrinsic evidence supports Great Lakes' interpretation. It does not. Even if the Intercreditor Agreement explicitly defined "Great Lakes Collateral" by reference to the Great Lakes Loan Agreement, neither document includes the Policy in its definition of "Great Lakes Collateral." In relevant part, paragraph 2.6 of the Great Lakes Loan Agreement requires Gabriel Oak Park to maintain its fire, hazard and extended coverage insurance on the inventory, equipment and other assets and declares that "Borrower hereby irrevocably assigns and grants to Lender a security interest in any and all proceeds of each such insurance policy." (R. 27-2, Ex. 1-A, Great Lakes Loan Agreement ¶ 2.6.) Similarly, in paragraph 3.1, the Great Lakes Loan Agreement delineates the categories of assets it considers "collateral": (1) all of Gabriel Oak Park's accounts, contract rights and others rights to receive payment; (2) all of Gabriel Oak Park's present and future instruments, documents, chattel paper and general intangibles; (3) all reserves, balances, refunds, deposits, credits, moneys, securities and other property at any time owing or belonging to Gabriel Oak Park; (4) all of Gabriel Oak Park's inventory; (5) all of Gabriel Oak Park's claims against Great Lakes; (6) all books, records, and other property relating to the collateral and Gabriel Oak Park's obligations; (7) all cash and non-cash proceeds; (8) all equipment, furniture, fixtures, office equipment and other

20

intangible assets of Gabriel Oak now owned or later acquired. (*Id.* at ¶ 3.1) The Policy is not referenced, explicitly or implicitly, in any of the Great Lakes Loan Agreements until the Third Amended Loan Agreement, which simply states that Swezey, in his capacity as the loan guarantor, assigned the Policy to Great Lakes. (R. 27-2, Ex. 1-A, Great Lakes' Third Am. Loan Agreement ¶ B.) None of the iterations of the Great Lakes Loan Agreement defines "Great Lakes Collateral" in a way that could include the Policy. (*See* R. 27-2, Ex. 1-A, Great Lakes Loan Agreement ¶ 3.1; R. 27-2, Ex. 1-A, Great Lakes' First Am. Loan Agreement at 20; R. 27-2, Ex. 1-A, Great Lakes' Second Am. Loan Agreement at 24; R. 27-2, Ex. 1-A, Great Lakes' Third Am. Loan Agreement at 28; R. 27-2, Ex. 1-A, Great Lakes' Fourth Am. Loan Agreement at 32; R. 27-2, Ex. 1-A, Great Lakes' Forbearance Agreement at 34; R. 27-2, Ex. 1-A, Great Lakes' Second Forbearance Agreement at 42.) Accordingly, the Great Lakes Loan Agreement does not support Great Lakes' interpretation of the Intercreditor Agreement or its argument that the definition of "Great Lakes Collateral" within the Agreement is ambiguous.

Great Lakes also points the Court to the affidavit of James Campbell, Senior Credit Officer of Great Lakes, which states that "Community Bank understood the terms of the contract." (R. 27-1, Ex. 1, Campbell Decl. ¶ 9.) Campbell did not attest, however, that the mutually agreed upon definition of "Great Lakes Collateral" included the Policy. In fact, Community Bank contends that it and Great Lakes negotiated the wording of the Intercreditor Agreement and specifically excluded the Policy as part of the Great Lakes Collateral. (R. 31, Community Bank's Reply at 7; R. 31-1, Ex. A, Suppl. Braasch Decl. ¶ 18.) Further, Community Bank and Great Lakes amended the Intercreditor Agreement in 2010, yet the definition of "Great Lakes Collateral" in the amended agreement is identical to the definition in the first Intercreditor Agreement. (R. 27-7, Ex. 1-F, Am. Intercreditor Agreement ¶ B.) Great Lakes has thus failed to

21

meet its burden to provide extrinsic evidence showing that its interpretation of the Intercreditor Agreement is equally plausible to the meaning of the plain language of the Agreement. *See Smith*, 890 F.2d at 846. Because the extrinsic evidence fails to support an argument that the Intercreditor Agreement is susceptible to an alternate interpretation, the Court interprets the Intercreditor Agreement according to its plain meaning, *see Grosse Pointe Park*, 702 N.W.2d at 113, and concludes that the Policy is not part of the Great Lakes Collateral.

Because the Policy is not part of the Great Lakes Collateral, the Intercreditor Agreement does not subordinate Community Bank's interest in the Policy to Great Lakes' interest. Thus, according to the first in time, first in right rule, Community Bank has the priority interest in the Policy. The Intercreditor Agreement does not provide a basis to grant Great Lakes' motion for summary judgment, nor does it provide a basis to deny Community Bank's motion for summary judgment. Great Lakes has raised additional arguments, however, and the Court now turns to its second argument.

> **B.** **Whether Community Bank's assignment of the Gabriel Oak Park Note invalidated its priority interest**

Great Lakes next argues that the reciprocal assignments of the Gabriel Oak Park Note by Community Bank and then Gabriel Chicago strip Community Bank of its priority interest in the Policy. (R. 28, Great Lakes' Mem. at 9.) Great Lakes argues that Community Bank specified which assets it was assigning to Gabriel Chicago when it assigned the Gabriel Oak Park Note: the amended loan and security agreements, a guaranty from Swezey, a guaranty from Gabriel Chicago, and a subordination agreement with Swezey, and a financing statement with subsequent amendments, but not an interest in the Policy. (R. 33, Great Lakes' Reply at 4-5; R. 27-10, Ex. 4, Gabriel Chicago Assignment.) Great Lakes thus argues that as a result of

22

Community Bank's failure to explicitly reference the interest in the Policy, Gabriel Chicago never received an interest in the Policy from Community Bank. (R. 33, Great Lakes' Reply at 5.) Great Lakes further argues that because Gabriel Chicago never received an interest in the Policy, Gabriel Chicago could not re-assign the interest when it assigned the Gabriel Oak Park Note back to Community Bank. (*Id*. at 5.) According to Great Lakes, Community Bank's only interest in the Policy arises from Gabriel Oak Park's original loan obligations. (*Id.*) Great Lakes contends that those obligations were cancelled when Community Bank sold the Gabriel Oak Park Note to Gabriel Chicago. (*Id.* at 5-6.) Great Lakes cites *Smith v. Material Service Corporation*, 38 N.E.2d 945, 960 (Ill. App. Ct. 1st Dist. 1942), for the proposition that when a note is paid, the holder no longer has any right to retain any part of the collateral, "as there [is] no debt to secure." (R. 28, Great Lakes' Mem. at 10.)

Community Bank counters that it retained its priority interest in the Policy through the various transactions. Community Bank avers that the Gabriel Oak Park Note preserved Community Bank's security interest in the Policy when it specified that "nothing herein shall . . . adversely affect any lien . . . or security interest securing such indebtedness . . .". (R. 31, Community Bank's Reply) (quoting R. 23-6, Ex. A-5, Gabriel Oak Park Note at 2). The subsequent Gabriel Chicago Assignment expressly grants Gabriel Chicago "all rights and claims [Community Bank] may have under the Loan Documents." (R. 27-10, Ex. 4, Gabriel Chicago Assignment at 1). The Loan Documents are explicitly defined in the Gabriel Chicago Assignment to include the Gabriel Oak Park Note. (*Id.* at ¶ 1) Thus, Community Bank argues that the Gabriel Chicago Assignment granted a priority security interest in the Policy to Gabriel Chicago. (R. 31, Community Bank's Reply at 4.) Community Bank further contends that when Gabriel Chicago reassigned the Gabriel Oak Park Note to Community Bank, Gabriel Chicago

23

also reassigned the collateral that secured the debt. (*Id.*; R. 31-2, Ex. A-1, Community Bank Assignment at 28.) Community Bank thus argues that its priority interest in the Policy was preserved, assigned to Gabriel Chicago, and reassigned to Community Bank as collateral for the Gabriel Oak Park Note. (R. 31, Community Bank's Reply at 5.)

According to Illinois law, "once a valid assignment is effected, the assignee acquires all of the interest of the assignor in the property and stands in the shoes of the assignor." *Stride v. 120 W. Madison Bldg. Corp.*, 477 N.E.2d 1318, 1320 (Ill. App. Ct. 1st Dist. 1985); *see also Strosberg v. Brauvin Realty Servs., Inc.*, 691 N.E.2d 834, 842 (1998) (noting that assignees of a note acquire any right to receive collateral that the assignor held, including rights of priority). In the Gabriel Oak Park Note, Community Bank preserved its priority interest in the Policy; therefore, Gabriel Chicago assumed Community Bank's priority interest when Community Bank assigned the Gabriel Oak Park Note to Gabriel Chicago. In turn, Gabriel Chicago's assignment of the Gabriel Oak Park Note back to Community Bank provided the same priority interest.

In order for an assignment to be valid, "there must be an intent to effectuate one, and that intent may be reflected by any instruments executed by the parties, as well as from surrounding circumstances." *In re Cycle Prods. Distrib. Co.*, 118 B.R. at 645 (quoting *Kramer v. McDonald's Sys., Inc.*, 378 N.E.2d 522, 536 (Ill. App. Ct. 1st Dist. 1978), *aff'd* 396 N.E.2d 504 (Ill. 1979)). Community Bank states that the intent of the parties was not only to transfer the Gabriel Oak Park Note, but also the collateral securing it, including the priority security interest in the Policy. (R. 31, Community Bank's Reply at 5; R. 31-1, Ex. A, Suppl. Braasch Decl. ¶ 16.) That intention is supported by the expansive language in the Gabriel Chicago Assignment, and Great Lakes offers no evidence to negate Community Bank's assertion. Thus, even if the priority interest in the Policy was not explicitly included in the Gabriel Chicago Assignment, it

24

was implicitly included in the broad assignment of "all rights and claims." Therefore, the Court concludes that the reciprocal assignments of the Gabriel Oak Park Note by Community Bank and then Gabriel Chicago do not strip Community Bank of its priority interest in the Policy.

###    C.    Whether there is outstanding debt to secure

Great Lakes next argue that the security interest in the Policy is only valid to the extent that there exists outstanding debt to secure. *See Smith*, 38 N.E.2d at 960. The record contains conflicting evidence as to whether Gabriel Oak Park has any outstanding debt to Community Bank. Great Lakes contends that all of Gabriel Oak Park's debt was paid off when Gabriel Chicago purchased the Gabriel Oak Park Note from Community Bank. (R. 27, Great Lakes' Facts ¶ 31.) Community Bank alleges that Gabriel Oak Park still owes it in excess of $229,512.76. (R. 24, Community Bank's Facts ¶ 20.) Community Bank provides an extensive proof of claim it submitted to the United States Bankruptcy Court for the Northern District of Illinois as evidence of Gabriel Oak Park's outstanding debt. (R. 27-16, Ex. 10, Part 1, Community Bank Proof of Claim.) In addition, Gabriel Oak Park's bankruptcy petition lists a subordinated outstanding debt of $229,512.76 to Community Bank. (R. 23-7, Ex. B, Gabriel Oak Park Bankruptcy Pet'n at 4, 12.) In a deposition pertaining to Gabriel Oak Park's bankruptcy filing, however, Swezey testified that Gabriel Chicago, not Gabriel Oak Park, owes Community Bank the outstanding $229,512.76. (R. 27, Ex. 2, Swezey Dep. at 93:2-94:8.) The Court concludes that a genuine issue of fact exists as to whether Gabriel Oak Park has any outstanding debt to Community Bank. This issue of fact is material because if Gabriel Oak Park is not indebted to Community Bank, Community Bank's priority interest in the Policy is extinguished. Thus, the crux of this interpleader action—which party is entitled to the surrender

value of the Policy—is in dispute.  Accordingly, neither party's motion for summary judgment can be granted.

Great Lakes provides additional reasons why the Court should deny Community Bank's motion for summary judgment.  Great Lakes argues that even if Community Bank has the priority interest, it failed to meet the preconditions set forth in the Policy Assignment Community Bank.  (R. 28, Great Lakes' Mem. at 13.)  In addition, it argues that the Policy assignments to both Community Bank and Great Lakes are liens, not assignments.  (R. 28, Great Lakes Mem. at 14.)  Those arguments do not provide a basis for the Court to grant Great Lakes' motion for summary judgment, however, and, having already concluded that granting summary judgment in favor of Community Bank would be inappropriate, the Court declines to address them.

## CONCLUSION

For the reasons set forth above, Community Bank's motion to strike (R. 13) is GRANTED in part and DENIED in part, and Community Bank's and Great Lakes' cross-motions for summary judgment (R. 22; R. 26) are DENIED.  The parties are requested to reevaluate their settlement positions in light of this opinion and exhaust all efforts to settle this case.  The parties shall appear for a status hearing on November 5, 2013 at 9:45 A.M.

ENTERED: _____

**Chief Judge Ruben Castillo**
**United States District Court**

**Dated: September 30, 2013**